## No. 13,628.

### State of Louisiana vs. J. R. Kellogg.

#### Syllabus.

1. Every court has the power necessary to the exercise of the jurisdiction conferred upon it, and, in the absence of specific provisions of law upon the subject, may adopt such means as may be necessary for the correction of irregularities in the drawing of juries and such like matters.

2. No special method is provided by law for the setting aside of the proceedings of a "jury commission" acting under the authority of Act 135 of 1898, in drawing a general venire, and, so far as the method is concerned, it is competent for the judge to set it aside by means of an order, made either in open court or in chambers and entered upon the minutes.

3. Act 135 of 1898 differs from Act 44 of 1877, in that the former contemplates that all the members required by law to constitute the jury commission shall, at least, have been qualified before any official action is taken by the body as a whole.

4. In any event, as the law contemplates that the jury commission shall consist of six persons, for a less number to act before the body had ever been

completed by the appointment and qualification of another member is an irregularity which it is competent for the district judge to correct by setting aside the proceedings.

5. A complaint that a person accused of crime was entitled to be tried by a jury selected from a venire drawn by a majority of the jury commission before the other members had qualified, when no fraud or specific injury is charged, is without merit.

6. It is competent for the trial judge to order talesmen from portions of the parish remote from the scene of the homicide, and the mere recital, in a bill of exceptions, that there is antagonism between the two sections of the parish will not affect the validity of such order, when it is not made to appear in what way such antagonism will be prejudicial to the defendant in the matter of his trial.

7. A juror, who, upon his *voir dire,* says "I have been thinking, since I was called up, whether I could entirely disregard them" (referring to rumors of the killing which he had heard), but who appears to have no bias, and who states that he finally concluded that he could try the case without reference to what he had heard, is a good juror.

8. It is within the discretion of the district judge to sustain the State's challenge, for cause, of a juror whose wife is an aunt of the wife of the accused. The accused has no just ground of complaint, since his right is to object, rather than to select.

9. Same, as to a juror, where it appears that the man whom the defendant is charged with having murdered had been tried for the murder of his brother

10. Where a witness is able to state intelligible passages from a conversation between the accused and the deceased at the time of the killing, and where there are strong indications that such passages embody the substance of all that was said; and where the accused has testified as a witness in his own behalf and has had the opportunity to supply any omissions in or modifications to, the passages as testified to, but has suggested none, the objection that the passages are "fragmentary" is properly overruled.

11. Threats and attempts upon one's life and bad character of the threatener do not justify the threatened person in killing the threatener at sight and with no hostile demonstration from the latter.

12. The aggressor upon the occasion of a homicide forfeits his right of self-defence, which he can recover only in case he withdraws in good faith from the attitude of aggression, distinctly informs his adversary that he desires peace, and is then pursued and led to believe, reasonably, that he is threatened with death or great bodily harm.

13. When the defendant on trial for murder admits that he began the attack which resulted in the killing, and offers no evidence tending to prove the facts necessary to revive his right of self-defence, it is competent for the judge, as a preliminary to ruling on the admissibility of evidence, to assume the non-existence of such facts. even though they bear upon the question of guilt or innocence. and his ruling that the evidence, the admissibility of which depended upon their existence, should be excluded, will be sustained.

14. Equally is this the case where several facts are to be proved, and the evidence offered tends to prove one or more, but not all of them.

15. But where. in such a case, the evidence offered relates to and tends to prove all the facts required, and those facts bear upon the question of the guilt or innocence of the accused, the question whether such facts are established should be submitted to the jury, together with the evidence, the admissibility of which was dependent upon the determination of such question.

16. The jurisdiction of the judge with respect to facts in criminal cases before juries extends only to collateral facts which are to be found in order to lay the foundation for rulings upon the admissibility of evidence. With respect to facts bearing upon the question of guilt or innocence, unless they are admitted, or unless there is no evidence tending to establish them, the question of their existence, *vel non,* should be submitted to the jury.

A PPEAL from the Eleventh Judicial District, Parish of Red River— *Porter, J.*

*Walter Guion,* Attorney General, and *W. A. Wilkinson,* District Attorney (*Wm. Pike Hall, Nettles & Carter* and *Lewis Guion,* of counsel) for Plaintiff, Appellee.

*Egan & Scheen (John D. Wilkinson, Stephen & Carter, John I. Teer* and *James C. Egan, Jr.,* of counsel) for Defendant, Appellant.

The opinion of the court was delivered by

Monroe, J. Defendant having been indicted for murder, was convicted of manslaughter, and sentenced to imprisonment at hard labor. He has appealed and presents his case by means of the motions and bills of exceptions, which will now be considered.

Bills Nos. 1 and 2 were taken to the overruling of motions to quash the indictment and the venire. It appears that the judge *a quo,* agreeably to the provisions of Act No. 135 of 1898, had named five citizens who, with the clerk of court, were to constitute the "jury commission," and had ordered that said commission meet and draw the venire and prepare the lists from which the grand and petit jurors were to be selected. Two of the persons so named failed to qualify, by taking the required oath, but the other three were sworn, and, together with the clerk, held a meeting and drew the venire and prepared the lists, etc., without regard to the fact that the other two members of the commission had not qualified. The trial judge, being informed of what had been done, made an order annulling and setting the same aside, and directing that the "jury commission," as completed by the swearing in of the whole number of members required by law, should meet and make a new drawing and prepare new lists, which was done, accordingly, and the grand jury by which the defendant was indicted was chosen from one of the lists so prepared. The defendant's complaint, as presented in the motions to quash the indictment and the venire, is, that the general venire was legally drawn, under the first order, by the three commis-

sioners and the clerk, constituting a majority and quorum of the jury commission; that the lists prepared therefrom were the only lists from which the grand and petit juries could, at the time defendant was indicted and tried, lawfully have been chosen for service in said District Court; and that the order of the judge, made in chambers, setting aside said venire and said lists, and ordering a new drawing and new lists, was illegal and unauthorized.

The statute, under which the judge *a quo* made the order appointing the jury commissioners, and instructing them as to their proceedings, provides that such orders shall be written and entered on the minutes (Secs. 3 and 4, Act 135 of 1898). The record shows that the first order, which it is said was valid, was so made and entered, and that the second order, which it is said was invalid, was made and entered in exactly the same way. In so far, then, as the second order directed what should be done, it was made in strict conformity to the statute, and in so far as it set aside what had already been done, our attention has not been called to any law prescribing any other method, and no better or more competent one suggests itself. We, therefore, conclude that, as to the mode, there is no just cause of complaint against the action of the trial judge, and we proceed to the inquiry, whether such action was, in other respects, competent and authorized.

By virtue of the general provisions of law, every court has the power that is necessary to the exercise of the jurisdiction conferred upon it (C. P. 877); and, in the matter of selection of jurors and of their service in the District Courts in this State, the statute governing the subject is made to depend for its efficient enforcement very largely upon the presiding judges, and much is, necessarily, left to the discretion of those officers. Hence, it is clearly within the authority, and is, moreover, the plain duty of a district judge to see that all the proceedings in his court, and particularly those which underlie trials by jury, involving human life, are regular and orderly. If, therefore, in the instant case, there was any irregularity in the proceedings which the judge *a quo* had ordered, agreeably to the provisions of the law, for the obtention of jurors, and upon which, directly or remotely, were to be based all the findings of the grand juries and all the trials before the petit juries thereafter to be presented and conducted in his court, it was his right and his duty to correct it, and it was for him to determine, as there was no one else authorized to act in the premises, whether an irregularity existed, and, if so, whether it was serious or trifling, and what remedy should be applied, since the law fails to particularize in that respect.

In the exercise of his undoubted jurisdiction, the trial judge determined that there had been irregularity in the drawing of the general venire, by reason of the facts which have been stated, and that the remedy was to set the proceedings aside, and he acted accordingly.

The authority to set aside a venire, in a proper case, is not questioned (State vs. Nash & Barnett, 46 Ann. 194), but it is said that this was not a proper case, because a majority of the "jury commission" was authorized to act and did act, though the other members of said commission had never qualified. And we are referred to the cases of State vs. Hornsby and State vs. Wells, 33 Ann. 1110 and 1407.

In those cases, this court construed Act 44 of 1877 which, though similar in many respects to the act now under consideration, differs from it in this; that the Act of 1877 contains the provision that "three members of said commission shall be a sufficient number to perform the duties imposed by this act," whereas, what may be called the corresponding paragraph in Act 135 of 1898 has superadded the following language, to-wit: *"provided* all the members shall have been duly notified by the clerk of the District Court of the time and place designated by him for the meeting of said commission," etc. This difference is not the result of accident, but signifies the intention on the part of the law-makers that the six persons who, under the statute, are to constitute the body known as the "jury commission," shall be placed in a position to participate at one and the same time in the work of that commission, even though, when that is accomplished, four out of the six may constitute a quorum with authority to prosecute that work.

But, if there had been no difference in the statutes, we should, nevertheless, hold that the motion to quash was properly overruled, for the reasons:

That, even though the drawing of the venire and the preparation of the lists (from which the grand and petit juries were to be chosen), by persons claiming to be a quorum of a body, which, under the law, was to be composed of six persons, when only four of such persons had ever qualified, should be held not, under all circumstances, to vitiate the subsequent action of the jurors so chosen, nevertheless, such a proceeding is irregular, to say the least of it, and it was the part of prudence and the exercise of a wise and competent discretion for the judge *a quo* to eliminate the irregularity.

That the complaint which the defendant makes, could, if sustained, lead only to the submission of his case to another grand jury, and yet any other grand jury which might be chosen would be obnoxious to the

same objection which he makes to the grand jury by which he was indicted, to-wit: that it was not chosen from the venire drawn in June, 1900, and set aside by order of the court.

That there is no charge that the alleged defect in the proceedings, whereby the jurors, by whom the defendant was indicted and tried, were chosen, had in it any element of fraud, or that it worked any specific injury to the defendant; and it is textual law and settled jurisprudence that it must so appear in order to justify the setting aside of a venire. Act 135 of 1898, Section 15; State vs. Rector, 35 Ann. 98; State vs. Sandox, 37 Ann. 377; State vs. Gonsoulin, 38 Ann. 459; State vs. Green, 43 Ann. 402; State vs. Simmons, 43 Ann. 991; State vs. Saintes, 46 Ann. 547.

Bill No. 3—to the overruling of defendant's objections to an order directing the sheriff to summon tales jurors from the west side of Red River, exclusively. The grounds of objection, as stated in the bill, are, "that, under the law, the prisoner is entitled to be tried by a jury of the " vicinage; and on the further ground that he is a resident on the east " side, or hill side, of Red River, on which side a majority of the white " people of said parish reside, and there exists antagonism and prejudice " between the two sides of Red River." The judge returns that he acted under the authority of Section 11 of the Act No. 135 of 1898, which authorizes him to direct that tales jurors be selected from a locality remote from the scene of the crime. The statements in the bill, as to antagonism between the two sides of Red River and as to the white population, do not tend to show that any prejudice resulted to the defendant from the drawing of the jurors from the west side of the river, since it does not appear that the persons summoned were different in color from himself, or that the defendant and the deceased were from different sides of the river, or were of different colors, or that the antagonism referred to is personal to the defendant, or that it is of such a character as to prevent any citizen from the west side of the river from according him a fair trial. State vs. Nash & Barnett, 46 Ann. 194.

Bill No. 4—to the overruling of the defendant's challenge, for cause, of W. J. Hogsett, who was called as a juror and who was, thereupon, challenged peremptorily, defendant thereby exhausting his peremptory challenges before the completion of the jury. The judge states that he refused to sustain the challenge for the reasons: "that the juror said he " lived eight miles from the neighborhood in which the killing occurred; " that he lived three and a half miles from the residence of the brother " of the accused, whom he knew, but whom he had not visited for two

" years; that Red Bayou ran between his place and this neighborhood,
" in which the Wrens and the prisoner lived, and separated the people
" into different communities; that he was not particularly friendly to
" any of the parties in this case; that he had heard rumors of the killing;
" that these rumors made an impression on his mind, and that 'I have
" been thinking since I was called up whether I could entirely disregard
" them.' Upon this, counsel for the accused challenged the juror for
" cause. Then, in response to questions by the court, the juror stated
" that if he were taken on the jury, he would be compelled to be guided
" by his oath; that he would try the case by the law and the evidence,
" without reference to anything he may have heard, or any impression
" he may have formed. The juror did not say that he had any doubt on
" this point, but merely that he had been thinking whether he could do
" so or not, and had concluded that he could. Before this case, I had
" been attracted by the exceptional intelligence and impartiality dis-
" played by the juror and I was fully satisfied that he was competent
" from every standpoint."

This statement leaves nothing to be desired, and brings the juror well
up to the required standard. Knobloch Cr. Digest, pp. 280 *et seq;*
State vs. Williams, 49 Ann. 1152.

Bill No. 5—to the ruling of the court sustaining the State's challenge
to the juror, Josh Norrid, who, being examined on his *voir dire,* said
that his wife was an aunt of the prisoner's wife. The connection
between the families of the juror and the accused offered reasonable
grounds for the presumption that the juror was favorably biased, and
we are of opinion that the discretion vested in the district judge was
properly exercised. Moreover, the right given to the accused is to
object, rather than to select, and it has been held that the rejection of a
juror by the trial judge, even if erroneous, "affords, of itself, no legal
ground of complaint to the accused." State vs. Creech, 38 Ann. 480:
State vs. Carrier, 39 Ann. 931; State vs. Shields, 33 Ann. 1410; State
vs. McCarthy, 44 Ann. 323.

Bill No. 6—to the ruling of the court in sustaining the State's chal-
lenge, for cause, of the juror, D. W. Pickett. The reasons given by the
judge for his ruling are that the man whom the defendant was charged
with having murdered had been tried for the murder of the juror's
brother, and acquitted, and that it was within the judge's knowledge
that there was a bitter feud between the Pickett family and that of the
accused. These reasons appear to us to be sufficient. State vs. Welsch
& Webster, 39 Ann. 931; Act 135 of 1898, Section 1. Aside from which

the matter is governed by the rule as stated above; that the right of the defendant is to object and not to select.

Bill A—to the overruling of the defendant's objections to the intro-duction of the testimony of W. M. Hunter, as to a conversation between the accused and the deceased, on the immediate occasion of the homicide, upon the ground that the witness was unable to give the whole of the conversation and upon the further ground that the court allowed the counsel to read to the witness his testimony given before the coroner's inquest. It appears from the testimony in question, which is annexed to the bill, that the defendant, Kellogg, was in the store of the witness, Hunter, who is his cousin, when the deceased, Wren, rode up, Hunter and one Willie Cannon being the only other persons present; that Kellogg picked up his gun from the top of a barrel, stepped out on the gallery of the store and, presenting the gun upon Wren, said to him: "Frank, what was you doing in my field, last Saturday evening was a week ago, waylaying me?" to which Wren replied that he was not in the field; that Kellogg said: "I want to know who was with you in my field?" and then Wren again denied having been in the field. The witness is then asked: "Then, what did Kellogg say?" to which he replied, "I don't remember what he said then, till after I had went back in my store; I think I was weighing some flour for Mr. Cannon. I did, not understand what was passing between them while I was in the store. I could simply hear them talking." Several questions were then asked, in reply to which the witness gives the impression that he heard no further conversation, and that the shooting took place within something like three minutes from the time that Wren came up. The judge, however, then asked: "Q.—After Wren, the deceased, had replied, or had stated, the second time, to the prisoner, that he was not in the prisoner's field waylaying him the night in question, what did the prisoner say to Wren?" to which the witness replied, "I think that was the question, or something like that, "I know you was in my field, Frank; if you show any cause for being there except to waylay me and kill me, I will let you off." The witness further testifies that he does not remember whether he had heard all that had passed up to that time; that he supposes that the conversation heard by him hardly occupied half a minute, and that after Kellogg spoke of letting Wren off, witness went outside to help Willie Cannon get on his horse, and that probably a minute or a minute and a half elapsed before the gun fired and Wren fell. His examination, so far as it appears in the record, concludes as follows: "Q.—Did you, or not, hear the whole conversation between

Mr. Wren and the prisoner at the bar? A.—No, sir; I did not. Q.— Will you state how far you were from them when the conversation began? A.—Yes, sir; right at Mr. Kellogg; I suppose a foot or two from him. Q.—What was the last remark you heard Mr. Kellogg make to Mr. Wren? A.—Well, I suppose it was more than a minute after I heard the last word that I understood (?). Q.—Do you know whether they continued talking? A.—Well, I could hear the sound of their voices. Q.—Were you in the back part of the store while the parties were talking? A.—I could not tell; I may have went back there; I don't think I went to the back of the store." The district judge makes a statement, in signing the bill of exceptions, from which we take the following, to-wit: "The witness who was on the stand * * * was "Wm. Hunter, a cousin of the accused and a contributor to his "defence fund. He was an extremely unwilling witness, and it was "apparent from his manner that he was undergoing a painful struggle "between his sense of duty and his desire to shield his kinsman. The "killing occurred one month before the trial, and, the day after the "homicide, the witness had testified before the coroner's jury. I had "this testimony before me at the time, and saw that it clearly detailed "the facts and conditions which immediately preceded the killing." The witness first stated "that he did not hear all the conversation "between the prisoner and the deceased, for the reason that after the "prisoner presented his gun on the deceased and stopped him, and "after the colloquy between the two, which he fully detailed, he went "out to the road for the purpose of helping Cannon, another witness, "on his horse, and that while there he could not hear what was said by "the parties. But, after considerable questions by the counsel for the "accused, the witness did say that he was not sure whether he could "remember all that was said while he was in a position to hear. After "the witness had stated what he had heard and seen, I permitted counsel "for the State to read over to him his testimony before the coroner, to "enable him to point out any discrepancies between the statement he "had just made and his testimony before the coroner. I found that the "two statements were strikingly identical. He pointed out, as the "court will see, only two discrepancies, which were inconsequential. "This examination satisfied me that the witness did remember the sub- "stance, if not the exact words of what was said by the parties at the "time of the killing, while he was in a position to hear. Of course, all "these proceedings were had out of the presence of the jury. * * * "The testimony before the coroner was not read before the jury, nor

" referred to in its presence. I do not understand the rule to be that a
" conversation between the parties to a difficulty, where one is killed by
" the other, as in this case, cannot be proved, unless the witness can
" give all, or the substance of all, that was said from the beginning of
" the difficulty to the end of it. Such a rule would exclude this import-
" ant mass of evidence in nearly every case. The rule, as I understand
" it, is that the witness ought to be able to give at least the substance of
" what he heard, and that what he does give must be complete, con-
" nected and sensible. State vs. Madison, 47 Ann. 31; State vs. Des-
" roches, 48 Ann. 430; State vs. Thomas, 28 Ann. 829. In this con-
" nection, it may be pertinent to state that the evidence of this witness
" was corroborated in every essential detail by that of the only other
" witness, except the accused, to the killing, while the accused himself
" corroborates both of the other witnesses, except as to the alleged
" attempt on the part of the deceased to draw a pistol, which neither of
" them saw. Besides, I think this testimony was admissible as part of
" the *res gestae.* I annex hereto, as part of my reasons for overruling
" this exception, certified copy of the testimony of Hunter and Cannon
" at the coroner's inquest."

It thus appears that the trial judge had before him not only the testi-
mony which was given by Hunter before the coroner, but he also had
that which had been given by Cannon, the only other witness who was
present at the killing; and, comparing it with the testimony given on
the trial, he concludes that the statements are not materially different,
and that they, each, embody the substance of what was said; that is to
say that there is no material conflict between them, and that either may
be regarded as practically complete, and as embodying the substance of
the conversation between the defendant and the deceased, though the
witness, Hunter, had reported somewhat more of that conversation in
his testimony before the coroner than in that given before the jury.

The rule applicable to evidence of this character is thus stated by Mr.
Bradner: "The whole of a confession must be received in evidence to
" render any part of it admissible, and it must be proved as it was
" made. In other words, when the party's admission is so qualified or
" explained by some other statement made by him at the same time, that
" the latter is in fairness necessary to present the true intention and
" meaning of the former, then the party is entitled to have it put in
" evidence, as a portion of the admission." Bradner on Evidence, 2nd
Ed., p. 221.

Mr. Stephens, dealing with the same subject, says: "It may, perhaps, "be well to observe that when an admission is contained in a document "or series of documents, or when it forms part of a discourse or con- "versation, so much and no more of the document, series of documents, "discourse, or conversation, must be proved, as is necessary for the full "understanding of the admission, but the judge or jury may, of course, "attach degrees of credit to the different parts of the matter proved." Chase's Stephen's Dig. Law of Ev., 2nd Ed., Note 1, p. 361. .

Admissions, confessions, declarations, conversations, discourses, and correspondence are governed by much the same rules, the underlying principles of which are that it would be unfair to offer in evidence and against a man, a part, or fragment, of something which he has said or written, and which, thus dissevered from some modifying or qualifying language, used at the same time, acquires a meaning which was not intended; and that it is only necessary to offer in evidence so much, and no more, of such admissions, declaration, conversation, etc., as is necessary for the full understanding of the same. It does not follow from this, therefore, that, if two persons are thrown together during the whole of a day and converse with each other upon a variety of topics and finally quarrel about something which occurs late in the evening, no testimony as to the language used during the quarrel is admissible, unless the witness can give the whole of the day's conversation. Nor does it follow that, where in the course of a conversation upon a particular subject, there are utterances which are distinct and intelligible in themselves, they may not be proved without proving also all of the conversation. The question to be determined in either case is, whether the utterances are to be regarded as complete and intelligible in themselves, or whether they may not have been modified by something said before or afterwards. State vs. Thomas, 28 Ann. 827; State vs. Madison, 47 Ann. 30; State vs. Spillers, 104 Louisiana Reports, p. —. In the instant case, the witness "supposes" that something "like three minutes" elapsed from the moment that the defendant brought his gun to bear on the deceased and asked him why he had been waylaying him until he fired the shot by which the deceased was killed. Common experience teaches that, in situations such as that described, there are few persons who appreciate the duration of minutes and seconds. We may, therefore, feel assured that Mr. Hunter had not understated the time, but, in all probability, has overstated it, and that no lengthy conversation, affording much opportunity for explanation, or for the utterance

of modifying and qualifying language could have taken place. It is shown that the defendant asked the deceased what he had been doing in his, defendant's field, waylaying him; that the deceased denied that he had been there; that the defendant repeated the question once or twice in different forms, and met with repeated denials; that he told the deceased that he would let him off if he would satisfy him that he had not been waylaying him in order to take his life; and it was within a minute, or a minute and a half, according to his testimony, after the witness, Hunter, heard conversation such as this, and whilst he had his back turned, in order to assist Cannon to mount his horse, that the deceased was killed. But, even then, the witness was at no great distance, for he testified before the coroner that Wren raised himself partly, after he was shot, "and seemed to try to say something like 'Oh Lordy,' in a struggling way." And, being asked, in his examination before the jury, "were you back in the store while the parties were talking?" he replied, "I could not tell; I may have been back there; I don't think I went to the back part of the store." All of which, taken in connection with the fact that he was, according to his own statement, within a foot or two of the defendant, when Wren rode up, renders it more than probable that the witness could have heard all that was said and did hear the substance of the conversation. Beyond this, however, it appears that the defendant, himself, as a witness on the stand, corroborated the testimony of Hunter and Cannon, and made no claim that anything more or less was said than was testified to by Hunter, or that the conversation between him and the deceased, as given by that witness, was incomplete, or that it was connected with, or qualified by, any language or remarks not given. In most cases in which the rules of evidence which are here invoked have been applied, it has been held that where part of a conversation or correspondence is offered, it is competent for the litigant, as against whom the offer is made, to offer the other part, in order that the whole of such conversation, correspondence, etc., may be before the court. And if, in any case, the part offered has been excluded, it has been because it was found to be impossible for either litigant, or both, to furnish the whole of the conversation, correspondence, etc., which was the subject of the offer. Under the law, as it now stands in this State, the defendant in a criminal prosecution may take the stand as a witness in his own behalf, and the defendant now before the court availed himself of that privilege. It was perfectly competent for him, in doing so, to have supplied any omissions of which the witness, Hunter, might have been guilty, in testifying as to

the conversation between him (the defendant) and the deceased, but, as we understand from the judge's statement, he found no such omissions, and corroborated the testimony as given. State vs. Oliver, 43 Ann. 1005.

As to the objection that the court permitted the testimony given by Hunter before the coroner to be read over to him, we presume that it has been abandoned, as it is not referred to in the brief. There is, however, no merit in it. The reading took place out of the presence of the jury, and was for the purpose of an inquiry, which it was for the judge alone to make—as to the admissibility of evidence. State vs. Allen and Carter, 37 Ann. 685. We, therefore, conclude.that the objections were properly overruled.

Bill B—to the exclusion of certain testimony to prove that the deceased had laid in wait on two occasions, ten days, and three. days, respectively, before the killing, for the purpose of taking the defendant's life; that he had presented his gun at the defendant, within shooting distance, and was prevented from shooting only by the presence of others; that the fact of these attempts was notorious in the neighborhood and was made known to the defendant, who was informed of the last waylaying, and of threats made by the deceased, on the evening before the homicide; and that the deceased was a dangerous man, who had been charged with assassination eighteen months before, and was generally believed to be an unrelenting foe.

The bill recites that the defendant, as a witness in his own behalf, testified, "that at the time of the shooting, he presented his gun, but not to his shoulder," and had a conversation with the deceased about the previous waylaying and threats the deceased had made against him; that, during the conversation, he "lowered his gun, putting its butt on the floor of the gallery, and, thereupon, the deceased threw his hand behind him, as if to draw a weapon, when the accused shot him." It also recites, as a fact, that, after the death of the deceased, a pistol, with four chambers loaded, was found in the back pocket of his trousers, and that the two witnesses examined for the State testified that when the fatal shot was fired they were not looking in the direction of the accused or the deceased, and that the latter were the only persons who knew what was done at that instant. There is no testimony annexed to this bill; and whilst the judge a quo, in giving his reasons for the ruling complained of, concurs in the statement of counsel as to the testimony given by the defendant, he, himself, makes the statement, based upon that testimony, and the testimony of the other witnesses in the case, that the

defendant was the original aggressor upon the immediate occasion of the killing, and we find no attempt at denial of this fact, either in the record or in the argument of defendant's counsel.

"The accused," says the judge, "was in Hunter's store, in which the postoffice is kept, when the deceased came up, and as he was approaching the door, from the outside, the accused picked up his gun, which was laying across the head of a molasses barrel, near the door, and, stepping out on the gallery, presented his gun upon the deceased, and asked him, "Frank, what were you doing in my field, last Saturday evening was a week ago, waylaying me?" The deceased denied that he had been waylaying the accused. The accused then asked the deceased who was with him in his (accused's) field. Deceased again denied that he had been in the field of the accused, and stated that, on the day mentioned, he had spent the day at the house of a neighbor, some distance from where the accused lived. When the accused first spoke to the deceased, and presented his gun, as above stated, the witness, Hunter, asked the witness, Cannon, "what shall we do?" The latter replied, "I am going home," and started to his horse, which was hitched in the road near by. The witness, Hunter, followed him for some purpose, and he stated that he had gotten about twenty steps from where the parties were when the gun fired, and he looked and saw the deceased fall. Hunter's testimony was corroborated by that of Cannon and the deceased" (should be accused) "who, testifying in his own behalf, corroborated both Hunter and Cannon, except that he swore that just before the shooting he took his gun down and rested it on the store gallery when the deceased attempted to draw a pistol, and he shot him."

Continuing, the judge says that a loaded pistol was found the next morning in the back trousers pocket of the deceased, and that there were also found on his person two letters which were to have been mailed in the postoffice. He further says that he declined to permit the proffered testimony, as to theats and menaces by the deceased and as to his alleged bad character, because he did not believe that, at the time of the killing, the deceased committed any assault or overt act and that no legal foundation for such testimony had been laid, in short, that he did not believe the testimony of the accused on that subject, and that, even if it were true, he seriously doubted, "in view of the undisputed fact that the accused was the aggressor at the beginning of the difficulty," whether it would constitute a sufficient foundation for such evidence.

It will not be denied that the weight of authority supports the proposition that "one who commences an assault, which is resisted with vio-

lence, is not excused in going to the extent of taking life, in avoiding a
danger to his own life which arises by reason of the violence of the party
whom he has assaulted." McClain on Cr. Law, Vol. I, Sec. 307 (*note*),
309, 310; Bishop on Cr. Pr., Vol 2, p. 614; Wharton's Cr. Law. 485;
Am. & Eng. Enc. of Law, Vo. 21, p. 1160; State vs. Rogers, 18 Kan. 78;
State vs. Neely, 20 Ia. 108; Clifford vs. State, 58 Wis. 477; Story vs.
State, 99 Ind. 413.

Nor can it be denied that the authorities concur to the effect that the
rights of self-defence revive in favor of the original aggressor only after
he has abandoned his purpose and has withdrawn, and has clearly made
known his desire or peace to the other party, and is then pursued; and
that a mere momentary cessation of hostilities, with no *bona fide,* clearly
expressed, intention to withdraw from the conflict, will not excuse what
he afterwards does on the ground of self-defence. McClain on Cr. Law,
Vol. 1, Sec. 310; Wharton on Cr. Law, Secs. 485, 486; Bishop's New
Cr. Law, Secs. 843, 865; State vs. Spears, 46 Ann. 1524.

The statement of the trial judge is explicit to the effect that it is
"an undisputed fact that the accused was the aggressor at the beginning
of the difficulty, and this statement is corroborated by that of the ac-
cused himself, as recited by his counsel, that, at the time of the shoot-
ing, he presented his gun," etc. Upon the other hand, it does not appear
that there was evidence legally sufficient, under any circumstances, to
show that the defendant, after commencing the attack, and before the
killing, withdrew in good faith from the position of aggression and
assault, which he had assumed, with the intention of abandoning his
original purpose, and that he clearly informed the deceased that he was
seeking peace. Upon the case, as presented, therefore, the defendant
must be held to have been the aggressor upon the immediate occasion of
the killing, from the beginning, when the deceased rode up to the store
and he stepped out on the gallery and presented his gun at him, until
the end, when the fatal shot was fired and the deceased fell, mortally
wounded in the road. And the law is that he is not entitled to avail
himself of the plea of self-defense; that all testimony as to the threats,
menaces and dangerous character of the deceased is properly excluded,
and that the question of hostile demonstrations on the part of the de-
ceased becomes immaterial, since such demonstrations, under the cir-
cumstances, no more excuse the killing than would the threats, menaces
and dangerous character of the deceased. Wharton's Cr. Law, Secs.
485, 486, 487, 493; Bishop on Cr. Pr., Vol. 11, Sects. 613, 614, 619, 620;

State vs. Kellogg.

Bishop's New Cr. Law, Secs. 843, 850, 865, 869, 872; McClain on Cr. Law, Vol. 1, Secs. 303, 306, 307, 310; Rice on Ev., Vol. 3, Sec. 365; Am. & Eng. Enc. of Law, Vol. 4, Secs. 692, 693, Vol. 21, p. 1160; State vs. Jackson, 33 Ann. 1087; State vs. Ford, 37 Ann. 443; State vs. Broussard, 39 Ann. 671; State vs. Paterno, 43 Ann. 514; State vs. Jackson, 44 Ann. 160; State vs. Harris, 45 Ann. 842; State vs. Nash and Barnett, 46 Ann. 194; State vs. Vallery, 47 Ann. 182; State vs. Stewart, *Ib.* 410; State vs. Compagnet, 48 Ann. 1470; State vs. Wiggins, 50 Ann. 330; State vs. Frierson, 51 Ann. 706; State vs. Robinson, 52 Ann. 622.

The counsel for defendant has called our attention to the case of Oder vs. Com., 80 Ky. 32, and we have found two other cases from the same court (Carico vs. Com., 7 Bush 124, and Bohannon vs. Com., 8 Bush 88) which hold that under conditions more or less similar to those which are presented in the bill before us a man may kill his enemy on sight, and without waiting for a hostile demonstration. But those cases are recognized as the most extreme which are to be found in the reports, and they are without support either among the text writers or the courts. See Rice on Ev., vol. 3, sec. 365; Wiggins vs. U. S., 93 U. S. 486; Bishop on Cr. Pr., secs. 619, 620. Mr. Wharton, in considering the conditions which would justify shooting on sight, also points out the course to be pursued under other circumstances, to-wit:

"It has sometimes been said that if A's life be made wretched by the reckless and desperate enmity of B, and if there is good reason to believe that B is intending to assassinate A, A is not obliged, forsaking his usual employments, to hide from B, but may arm himself, and on meeting B shoot B down, without waiting to receive B's shot. No doubt, supposing a community to be without an authorized police government, and supposing B to be a ruffian actually seeking A's life, when no other process can be used to check him, then A is excused in taking this violent, but only possible, way of saving his own life, by sacrificing that of B. But it is otherwise where there is opportunity to invoke the interposition of the law. A man who believes his life is in danger, but whose rights are not yet attacked, ought, if he has access to a tribunal clothed with the ordinary powers of a justice of the peace, to apply to such tribunal to interfere. If he have ground enough to excuse him in killing the person from whom he believes himself in danger, he has ground enough to have that person bound over to keep the peace, or committed, in default of bail." Wharton's Cr. Law, sec. 485, 486.

From a note upon the same subject, taken from Horrigan & Thomp-

State vs. Kellogg.

son's Cases on Self-Defense, p. 406, with which we are furnished by
defendant's counsel, we make the following extract, to-wit:

"Thus, though the right to shoot an adversary on sight, who threatens
and seeks one's life, without waiting for an overt act, is, except in the
above cases" (referring to three cases, probably those from Kentucky,
which had been considered in the text), "universally repudiated as a
rule of law, yet there are manifest cases to which courts should, and
juries surely would, apply even this rule. For instance, there are, in
some parts of the American Union desperate characters, whose hands
are well known to be stained with the blood of many murders, who are
the constant dread and terror of every community in which they happen
to abide, who take human life on slight provocation, and frequently on
no provocation at all, and who generally kill by taking undue and cow-
ardly advantage of their victims. Now, if one of these characters or
desperadoes should threaten to kill a peaceable citizen "on sight," should
be foiled in an attempt to kill him, and should afterwards lie in wait for
him, or hunt him for the purpose, and they should accidentally meet,
and the peaceable citizen, without waiting for the desperado to draw his
weapon, or without passing by and running the risk of being shot in the
back, should instantly shoot and kill him, no court could, with reason,
say that this was not self-defense, and no jury, not composed of a clan
of outlaws, would convict him of any crime."

It will be seen, however, that the case at bar is neither a case arising
in a community without an authoritative police government, as sup-
posed by Mr. Wharton, nor is it a case in which it is made to appear that
the deceased was such a character as is described in the excerpt from
Horrigan & Thompson. Upon the contrary, it belongs to the category
of cases to which is to be applied the statement of the authors last men-
tioned, that the "doctrine of the right to shoot an adversary on sight,
who threatens and seeks one's life, without waiting for an overt act is
*   *   *   universally repudiated as a rule of law."

It is said that, whether the defendant commenced the attack, and
whether he thereafter withdrew and was pursued by the deceased, and
whether the deceased committed an overt act threatening the defendant
with death or great bodily injury, are questions which should have been
submitted to the jury, together with the rejected evidence as to the ante-
cedent threats, menaces and dangerous character of the deceased. This
view merits, and will receive, further consideration.

Dealing with the proposition last stated, viz., that the question
whether the deceased committed an overt act should have been submitted

to the jury, it is plain, for the reasons which have been stated, that, if the defendant began the attack and persisted in the same until the deceased was killed, the plea of self-defense was not available to the defendant, and that, no matter what was done by the deceased in the effort to save his life, it would have afforded no excuse to the defendant, and, hence, that the defendant could not have been prejudiced by the exclusion of evidence concerning it from the jury.

We come then to the inquiry, should the question, "did the defendant begin the attack upon the occasion of the killing?" have been submitted to the jury?

It was admitted on the trial, and it is not denied now, that the defendant was the original aggressor upon the occasion of the killing, and, the fact having been admitted, there was no question of its existence to be submitted to the jury.

The next inquiry is, should the questions, "did the defendant persist in his attack, or did he withdraw and so inform the deceased, and were the conditions such as to have revived his right of self-defense?" have been submitted to the jury? The Constitution of the State provides that the "jury, in all criminal cases, shall be the judges of the law and of the facts *on the question of guilt or innocence,* having been charged as to the law applicable to the case by the presiding judge." Art. 179.

There can be no question, therefore, that the facts "on the *question of guilt or innocence*" of the accused in a criminal trial are to be found by the jury, and by them, exclusively, since no one else except the judge has any function to discharge in the matter, and the function of the judge does not conflict with that thus assigned to the jury. It will be observed, however, that the exclusive jurisdiction thus conferred on the jury extends only to "the facts on the question of guilt or innocence," and does not embrace other facts of a collateral kind such as it might be necessary to find in order to lay the foundation for rulings upon the admissibility of evidence; as, for example, those relating to the competency of a witness, those going to lay a foundation for the admission of secondary evidence as to the contents of a lost instrument, etc. With reference to such facts as these, the jurisdiction, not being vested by the language of the Constitution in the jury, is properly exercised by the judge for the purposes of the discharge of the duty of determining as to the admissibility of evidence, and the rule by which he is governed is thus stated by competent authority, to-wit: "In determining any preliminary fact, essential to the admissibility of evidence, the rule is the same, as to the preponderance of testimony, as in cases of issues tried

by juries; it is not sufficient that there may be evidence tending to establish the particular fact, but the judge must be satisfied of it by competent proof."

Charging the Jury, Thompson, p. 6.

DeGraffenried vs. Thomas, 14 Ala. 681, 687.

But this rule—that the judge must be satisfied by competent proof—has no application to the finding of facts which bear upon the question of guilt or innocence, since, as we have seen such facts are to be found by the jury, and not by the judge.

Applying these preliminary conclusions to the conditions with which we are dealing:—

The fact being admitted that the defendant began the attack upon the occasion of the killing, it follows as a matter of law that he thereby forfeited his right of self-defence. But if he thereafter abandoned his purpose, withdrew in good faith from his attitude of aggression, or sought to withdraw, and clearly informed the deceased that he desired to be at peace; and if the deceased then pursued him, and made hostile demonstrations, threatening him with death or great bodily harm, the defendant's right of self-defense revived, and if he killed the deceased, while in the enjoyment and exercise of that right, he was guilty of no crime. The facts involved are, viz: did the defendant withdraw in good faith from the attack which he had begun; did he clearly inform the deceased that he desired peace; did the deceased then pursue him with hostile demonstrations, so that the defendant entertained the reasonable belief that he was in danger of losing his life, or suffering great bodily harm? therefore, bear directly upon the question of guilt or innocence; hence, if the question of their existence is to be determined, the obligation to determine them devolves upon the jury. We have concluded, however, that, when a fact has been admitted, the question of its existence, *vel non*, no longer exists, and cannot, therefore, be referred to the jury. And, if it be true that the jury is not to be called on to find a fact which is admitted, because it is admitted, equally is it true that a jury should not be called on to find that a fact does not exist where no evidence whatever of its existence has been offered, since, applying maxim, *quoad non apparet, non est*, a failure to make even a *prima facie* showing of existence is equivalent to an admission of non-existence. Where, then, certain facts are to be found as a condition precedent to the introduction of evidence, not otherwise admissible, but no attempt whatever is made to establish them, the judge, in the discharge of the duty of ruling upon the admissibility of such evidence, is

not obliged to refer the question of the existence of such facts to the jury, and, at the same time, admit the evidence, as though such existence had been established.

The soundness of this proposition will probably be admitted, since the utmost that is claimed by those who most zealously uphold the right of trial by jury is that where there is any evidence, however slight, tending to support a material fact, the case must go to the jury, since they are the exclusive judges of the weight of the evidence.

Upon the same principle, it follows that if the establishment of several antecedent facts is necessary in order to lay the foundation for the introduction of evidence not otherwise admissible, and the proof administered tends to establish one of such facts, but does not touch or relate to the others, either directly or by reasonable inference, the judge need not refer to the jury the question whether the necessary foundation is laid, and is under no obligation to admit the evidence as though all the facts necessary had been proven.

Neither in such a case, nor in the case just before stated, would it be legally possible for the jury to find the facts required as a foundation for the introduction of such evidence, and the judge is not expected to admit evidence requiring a foundation, when he knows that such foundation is not laid, and that it is legally impossible for the jury to find that it is laid.

Where, however, the admissibility of evidence depends upon the determination of a prior fact, or of prior facts, bearing upon the question of guilt or innocence, and there is any evidence, however slight, applicable to, and tending to establish, all such facts as are absolutely necessary, the whole evidence should be admitted to the jury, for the question then becomes one of the credibility of witnesses or the weight or preponderating force of the evidence, which it is peculiarly the province of the jury to determine.

McClain on Cr. Law, vol. 1, secs. 303, 307; Allison vs. U. S., 160 U. S. 204; Wiggins vs. People, etc., 93 U. S. 465; Rice on Ev., vol. 3, secs. 90, 91 and 201; Const. of La., Art. 85.

It is true that, in the case of State vs. Ford, 37 Ann. 443, the jurisdiction which, as we have seen, is vested in the trial judge with respect to collateral facts, was held to extend to facts bearing upon the question of guilt or innocence, and that precedent has been followed in later cases. A careful reconsideration of the subject has, however, led to the conclusion that our fundamental law requires that, where it becomes necessary to determine the question of the existence *vel non* of any fact

bearing upon the guilt or innocence of the accused in a criminal case, such question should be submitted to the jury, provided there is any evidence tending to establish such fact. But, applying these conclusions to the instant case, the only basis to be found upon which it could be contended that the defendant occupied any other position than that of the attacking party upon the occasion of the homicide is the statement, made by him in giving his testimony, and which is recited by his counsel in the bill of exceptions, as follows: that, during his conversation with the accused, he at one time "lowered his gun, putting its butt on the floor of the gallery," and, thereupon, "the deceased threw his hand behind him as if to draw a weapon, when the accused shot him."

If the defendant had also testified, when on the stand as a witness in his own behalf, that he intended to withdraw from the attack which he had begun, and that the lowering of his gun was an act done in the furtherance of that intention, and with a view of conveying to the deceased information as to the same, it might reasonably be claimed that there was evidence tending to establish the facts necessary to have revived the defendant's forfeited right of self-defense. But the mere lowering of the gun, and putting its butt on the floor of the gallery, coupled, as it is, with the statement that the defendant, so far from disabling himself for quick action, immediately thereafter shot the deceased before the latter could draw the pistol which he had in his pocket, cannot be said to tend to prove anything of consequence. It was a momentary cessation of hostilities, having no distinct tendency in any particular direction. Upon the other hand, judging of defendant's intention in the manner usually regarded as most authoritative, i. e., from his language; it appears from his conversation with the deceased, so far as it is reported up to the instant of the killing (and the opportunity was afforded him of supplying all omissions in the report), that he intended to hold the deceased to a strict accountability, and that he did not intend to depart from the position which he had assumed when he first brought his gun to bear on the deceased.

For the reasons, therefore, that the defendant, by his own admission, had forfeited his right of self-defense, by commencing, with a deadly weapon, the attack upon the deceased, and that he offered no evidence tending to establish the facts necessary to the revival of such right, we are of opinion that the judge a quo ruled correctly in declining to submit to the jury the question whether such facts had been established,

and in declining to admit evidence as to the alleged antecedent threats, menaces and dangerous character of the deceased.

In their brief, the counsel for the defendant contend that the excluded evidence should have been admitted for the additional reasons: that it would have corroborated the evidence of the defendant, and that the State had opened the question of the truth or falsity of the charge that the deceased had waylaid the defendant. We do not find these questions raised elsewhere than in the brief, and must, therefore, decline to consider them. State vs. Red, 32 Ann. 819; State vs. Nelson, *ib.* 842; State vs. Green, 36 Ann. 185; State vs. Johnson, *ib.* 852; State vs. Moore, 38 Ann. 66.

A bill of exceptions was taken to the refusal of the judge to give certain special charges, stating the law to be substantially as laid down by the Court of Appeals of Kentucky in the case of Oder vs. Com., 80 Ky. 32. This question has already been dealt with and need not be further considered. There was also bill to the denial of a motion for new trial, based upon the allegation that the verdict was contrary to the law and the evidence, and that the principal part of the evidence offered by the accused was excluded. This also may be passed without further comment.

Judgment affirmed.

Rehearing refused.

The Chief Justice and Mr. Justice Breaux concur in the decree.