MONROE, J.
This ease comes before the court upon bills of exception reserved during the trial and upon the making peremptory of a motion to quash an indictment for murder. The grounds relied on to sustain the motion are: (1) That the jury commission, charged with the selection of the venire from which the grand jury was taken, was an illegal body, in that its members had not taken the oath prescribed by law; (2) that one of them-, having qualified in another office, there was a vacancy in the membership at the date of the finding of the indictment; (3) that, even if the commission were legally constituted, the grand jury venire was illegal, because the members were not “selected” as required by law; (4) that the grand jury became functus officio on November 13, 1906, before the finding of the indictment herein, because, though adjourned to that day, it did not then meet, or again assemble, until February 6, 1907; and (5) that J. A. Shaffett, one of its members, who participated in the finding of said indictment, was unable to read and write the English language.
On the trial of the motion, defendant excepted to the refusal of the court to permit the grand juror Shaffett to be examined as a witness to prove that he was unable to read and write English, and the state excepted to the overruling of its objections to the testimony of J. L. McAdam and John T. Young to the effect, in the one instance, that before qualifying as a grand juror Shaffett had declined to accept a position as clerk of a church on the ground that he was unable to read and write, and, in the other instance that after the finding of the indictment herein he had admitted that he was unable to read and write. Subsequently, however, the state called Shaffett himself to the stand and elicited his testimony upon the question at issue, and it is conceded that the bills of exception mentioned thereby became valueless. Another bill was reserved by the state to the refusal of the court to direct the entering upon the minutes, as of date September 11, 1906, of an order made by the judge upon that date, and during the vacation of the court, to the ef *795 feet that the jury commission should assemble for the discharge of their duties on September 13, 1906, which order had not been entered at the time that it was made or afterwards. It is undisputed that the order was made, and its validity and force were not affected by the failure of the clerk to enter it on the minutes. State v. Taylor, 44 La. Ann. 783, 11 South. 132; State v. Hall, 44 La. Ann. 976, 11 South. 574. The remaining bill was reserved to the ruling of the court sustaining the motion to quash, and the evidence adduced upon the hearing of the motion is annexed to and made part of it. The grounds upon which the motion rests will be considered in the order in which they have been hereinabove stated.
1. Act No. 135, p. 218, of 1898, § 3, provides:
“That the several district judges * * * shall select and appoint five discreet citizens and good men and true, able to read and write the English language, who, with the clerk of the district court, or, in case of the inability of said clerk to act, for any cause, his chief deputy, as a member thereof ex officio, shall constitute a jury commission, * * * and shall hold their office during the pleasure of the district judge; provided, that no person holding any office under the state, or any parish or municipality therein, shall be competent to hold the office of jury commissioner. The evidence of the appointment of said jury commissioners shall be the written order of the district judge, which order shall be entered upon the minutes of the district court; and, before entering upon the discharge of their duties, the persons thus appointed members of the commission shall take an oath, faithfully, to discharge the duties imposed upon them by this act. Three members of said commission, together with the clerk of the district court, shall be a sufficient number to perform the duties imposed by this act; provided, all the members shall have been duly notified, by the clerk of the district court, of the time and place designated by him for the meeting of said commission, which notification shall appear from the certificate of the clerk in case of the absence of any member thereof.”
In. the instant case it appears that five commissioners were appointed in March, 1905; that four of them took an oath reading, “I will support, the Constitution and laws of the United States and the Constitution and laws of this state, and * * * I will faithfuly and impartially discharge and perform all the duties incumbent on me as jury commissioner for the parish of East Baton Rouges, according to Act 135 of the Legislature of 1898, according to the best of my ability and understanding; so help me God;” and that the other commissioner (Wolf) took only the oath beginning with “I will faithfully” and ending with the word “God,” as incorporated in the foregoing.
The Constitution provides:
“Art. 160. Members of the General Assembly and all officers, before entering upon the duties of their respective offices, shall take the following oath, or affirmation: T (A. B.) do solemnly swear (or affirm) that I will support the Constitution and laws of the United States and the Constitution and laws of this state, and that I will faithfully and impartially discharge and perform all the duties incumbent on me as --, according to the best of my ability and understanding. So help me God.’ ”
This provision of the fundamental law in effect forbids all public officers from entering upon the discharge of their duties until they shall have sworn, or affirmed, that they will support the Constitution and laws of the United States and the Constitution and laws of this state, and will faithfully and impartially discharge and perform all the duties of such offices. That jury commissioners are public officers, within the meaning of this law, there can be no doubt. State v. Newhouse, 29 La. Ann. 824; State v. Arata, 32 La. Ann. 193; State v. Dellwood, 33 La. Ann. 1229; State v. Nockum, 41 La. Ann. 689, 6 South. 729; State v. Fuselier, 51 La. Ann. 1317, 26 South. 264; State v. Scott, 110 La. 371, 34 South. 479. And that in this instance four of the five officers appointed to constitute the legal entity to be known as the “Jury Commission, ”■ after taking the oath required by the Constitution, also took an oath imposed by a particular statute faithfully to discharge the duties imposed upon them by such statute, did not, as we think, militate against the sufficiency of their qualification, since, quoad *797 the statute in question, they merely swore a second time faithfully to discharge the duties incumbent on them. With regard however, to the commissioner who did not swear, or affirm, that he would support the Constitution and laws of the United States and the Constitution and laws of this state, but only that he would faithfully discharge the duties incumbent on him as jury commissioner, “according to Act 135 of the Legislature of 1898,” it is evident that he was never legally qualified to enter upon the discharge of those duties, and hence that the jury commission, which the law requires shall be constituted of five members, with the clerk, or his chief deputy, was not established, and, not having come into existence could not legally have performed any of the functions assigned to it. State v. Kellogg, 104 La. 580, 29 South. 285.
Apart from this, however, the appointee who had not qualified participated with the commissioners who had qualified, and with the clerk, in the proceedings of September 13, 1906, when the general venire list was supplemented and the names of the 20 persons (from whom the foreman and members of the grand jury were subsequently selected and drawn) were taken out, and such participation vitiated those proceedings, since the law requires that they shall be conducted by certain sworn officers, and not by such officers acting in conjunction with other persons not so sworn.
2. If the law, which provides that the jury commission shall consist of five members (and the clerk), should further have provided that all such members, together with the clerk, should act in the discharge of the functions of the commission, it is clear that no action of the commission would be legal unless participated in by all its members and the clerk.
As the matter stands, the law, after providing that the commission shall consist of five members (and the clerk), further provides that “three members of said commission, together with the clerk * * *, shall be a sufficient number to perform the duties imposed by this , act; provided, all the members shall have been duly notified,” etc. The requirement that all the members who in contemplation of the law constitute the commission shall be taken into account is as obligatory in the one case as in the other. It is obligatory in the first case because the participation of all the members would be needed for legal action. It is obligatory in the instant case because, though all the members are not needed for action, all of them are required to be notified and afforded an opportunity to participate in any action that may be taken, and the notice cannot be given if the places which the law contemplates shall be so occupied are not filled with persons capable of receiving such notice. It may be said that the requirement as to notice means only that it shall be given to appointees who have actually qualified; and this is true to the extent that notice could properly be given to no one else. But the question recurs: Does it satisfy the law, which requires that the commission shall consist of five members and that all the members shall be notified, that notice be given to three members, because, perhaps, the judge has not seen fit to comply with the law and appoint a greater number? If so, then it is the judge, and not the Legislature, who determines how many members are needed to constitute the commission, and a commission established by the judge, with three members, is vested with all the duties with which the Legislature has seen fit to provide that its commission, of five members, shall be vested and charged. We find no sufficient reason for adopting a construction which leads to such a conclusion, and prefer adhering to the view, expressed in the case of State v. Kellogg, 104 La. 584, 29 South. 287, that the intention of the lawmaker is “that the six persons who, under the statute, constitute the jury commission, *799 ■shall be placed in a position to participate, ■at one and the same time, in the work of that commission, even though, when that is accomplished, four out of the six may constitute a quorum, with authority to prosecute the work.”
3. The law (Act No. 135, p. 220, of 1898, ■§ 7), as amended and re-enacted by Act No. 155, p. 262, of 1906, reads:
“That it shall be the duty of the jury commission, twice in each year, except in the parish ■of Cameron, to select the names of 20 persons, in the manner provided in section 4 of this act, to ■serve as grand jurors until their successors are selected and qualified ; and it shall be the duty of the district judge, in each parish, to impanel a grand jury twice in each year, except in the parish of Cameron,” etc.
Section 4 of the act (No. 135, p. 218, of 1898) provides that:
“Immediately after completing the said general venire list, the commission shall select therefrom the names of 20 citizens, possessing the qualifications prescribed by section 1 of this act, to be taken from different portions of the parish, as far as practicable, who shall be subject to duty as grand jurors during the term of six months,” etc.
The procés verbal of the proceedings of the commission, of date September 13,1906, reads in part as follows:
“And, having supplemented the general venire box, * * * proceeded to draw therefrom the names of 20 persons qualified to serve as grand jurors, * * * as follows:
1 H. L. Fuqua........1
2 G. H. Brooks.......1
3 Emile Pujol......... 1
4 W. O. Whitaker.....2
5 R. A. Hart...........2
6 A. Grouchy, Jr......2
7 James Clayton.......3
8 J. J. Howell.......... 3
9 N. B. Brown........4
10 J. W. Fields.........4
11 J. A. Somers........ 5
12 T. W. Mullican......5
13 Sam McConnell...... 6
14 J. D. McGregor......6
15 Jim. Melton..........7
16 V. L. Dixon.......... 8
17 L. P. Landry........8
IS Will Sharp...........9
19 J. A. Shaffett........10
20 Joe Young...........10
“And,' having selected the above 20 names to serve as grand jurors, as directed by said order and according to law, did place,” etc.
It was stated in the argument, and not disputed, that the figures to the right of the names in the foregoing list indicate the wards in which the jurors respectively reside, and that the wards having the larger populations are credited with the larger representation on the grand jury, and so on, in proportion. Under these circumstances, as the law requires the names to be taken by selection, as the proces verbal reads, “And, having selected the above 20 names * * * according to law,” and as the different wards of the parish could hardly have been given their proportionate representation in any other way, we conclude that the law was complied with, and that the names were selected.
4. It is shown that on October 30, 1906, the grand jury, with leave of the court, adjourned to November 13th; that on November 6th the then judge of the district court resigned; that his successor, the present judge, did not qualify until February 5, 1907; and that on February 8, 1907, the indictment herein was returned into court. It is also shown that the grand jury which brought in the indictment herein was impaneled on October 15, 1906, to serve for six months, or until their successors should have been qualified. The term of service of its members had not, therefore, expired when the indictment herein was presented, and we know of no law under which the body became functus officio because the office of judge became vacant and there was no one for it to report to.
5. On the question of the ability of the grand juror Shaffett to read and write, the following is the substance of the testimony adduced:
J. L. McAdam (for the defense) testifies that he has known Shaffett for about 15 years, has known him thoroughly, has lived in the same ward with him up to within one year, and has been a member of the same church; cannot say, positively, whether he can read or write; never saw him do either; never saw him read a newspaper; knows that he was offered a position in church which required that capacity, and .that he declined it.
“He was nominated for church clerk, and he got up and stated that he was ashamed to say it, but he couldn’t serve, because he couldn’t read *801 or write. * * * Q. (on cross-examination). Did he state that he couldn’t read and write well enough to do this work? A. No, sir; the words of Mr. Shaffett were, as near as I remember, T am ashamed to say that I cannot, read and write.’ • * “ It may have been two or three years ago, though I can’t recall the exact date. * * * It might have been five years ago,” etc.
John T. Young (for defense) testifies that he has .been clerk of the court, sheriff, and assessor; has known Shaffett all of his life; knew his father. Being asked, “Can Mr. Shaffett read and write in the English language?” he answers, “No, sir; he can write his name mechanically.” Being asked, “How do you know he can write only mechanically?” he answers, “I simply know that he can’t.” He further testifies that he called on Shaffett “to see if the indictment couldn’t be" set aside,” and that Shaffett told him that he could neither read nor write, “that all • he could do was to sign his name, and he said, ‘If they would have to throw out the verdict on that account, they would have to do it.’ * * * I told Mr. Shaffett that there was an intended motion to quash the indictment on the ground that he couldn’t read or write, and he said, T can’t read or write, and, if they want to set that aside on account of my ignorance, let them do it.’ That is as near as I can recollect it.”
Philip Sabbagh (for the state) testifies that he keeps a dry goods store; that Shaffett has dealt with him quite frequently; that he has sometimes come with a memorandum in his hand; and the testimony runs as follows:
“He say: ‘Philip, wait on me. I have a little memorandum for a few little articles.’ And he counted it — one pair of shoes, one, two, three, five, seven. Q. Would he call off his shoes? A. he would look at that. I don’t know whether number or writing. Q. Look at what? A. You know ; the paper — memorandum. If I see— I can’t explain what kind, because I can’t read and write. * * * Q. You don’t know what was on the paper? A. No, sir. * * * Q. Did you ever receive a written order from hi.m for any goods? A. No; sir. * * * Q. Did he ever write an order in your presence to anybody? A. No, sir; his wife wrote sometimes to the young lady.”
J. A. Shaffett (for the state) testifies that he has lived in the parish all his life; has a family and some property;, speaks English only.
“Q. The contention here is the fact whether or not you are able to read and write English? A. Well, I couldn’t say that I am a good scholar; but I can go off by myself, in my home, and, when I am not excited, I could read to some man I am acquainted with. I could write him a note. I couldn’t spell anybody’s name, as I have had very little advantage of school. Q. You could read, too? A. I can read when I am npt excited; but I can’t do it now, and I wouldn’t attempt to do it. * * * Q. Can you read ordinary print? A. Well,'I tell you, I can take it to myself and read it when I am not bothered by any one. Even in my own home, if I take a book, and if a person looks over my shoulder, I can’t read. I used to read, but I got out of practice of it.”
The witness goes on to say that he at one time read the Bible, but could not understand it by any means, and gave it up some years ago; that he has signed his name, in registering and on- a note, and on (what he thinks was) a mortgage; that the testimony of Me-Adam is true, but that he meant, when he said he could not read or write, that he was not enough of a scholar to act as clerk of the church; that the reason he was so ready in answering Mr. Young was that he thought Mr. Young meant “a man who can read and write anything at any time,” and that he was unable to do that. Being asked whether he could write a sentence, at dictation, he replies that he does not believe that he could, and would not attempt it; that he does not believe he could read a sentence of a dozen words in a plain handwriting, and would not attempt it; that he would not attempt to read the large letters in the indictment.
“My reason for it is, I am excited over the matter. I have been mad for a week over it, and it has taken all my nerve from me. I have got no nerve. * * * Some eight or ten years ago, I could read very well; but I haven’t done any lately, * * * not a great deal. Q. (counsel again taking the indictment in this case and showing it to the witness). Oan you tell us what that paper is? A. No, sir; I could-n’t tell you, and I wouldn’t try. * * * Q. Won’t you look at it, and try whether you can *803 or not? A. (taking from counsel the indictment in this case and reading the large letters at the top of the indictment). ‘State of Louisiana, Parish of East Baton Rouge.’ Does that satisfy you? Q. Can you tell me what paper it is? A. No, sir. * * * Q. * * * Can you read this written portion in the body of this indictment? A. No, sir; I wouldn’t try to read it here, and I wouldn’t attempt to read it here.”
Witness, then, at the request of counsel, spells the printed, word “Indictment” on the back of the instrument, but says he does not know what it spells, and could not say what name is signed thereunder (being the name of the clerk). He is then asked to read article 1 of the state Constitution, and replies:
“Well, I ain’t going to do it. Q. Can you read it? A. I can’t read it here, and I ain’t going to do it. * * * ” .
“By the Court: The request is to take that book into the jury room, and to take your time, and come back and read it.
“By the Witness: Well, I am a bad speller, and I couldn’t spell then to save myself. How many more times do you want me to tell you that I can’t do it? I can’t do it to-day, anywhere.”
He further declined to write anything. He testifies that he is a farmer 43 years old; that he works in the field, splits rails, etc., enjoys good health, and does not pay much to the doctors.
It will be seen that no one capable of knowing testifies that the juror can read or write, or has ever done so, save the juror himself, and that his testimony, whilst suggestive of a doubt whether he really knows, is contradicted by the testimony of two unimpeached witnesses to the effect that he has at different times admitted that he can neither read nor write. Our conclusion is that he cannot read or write the English language, as contemplated by the law; that is to say, to any purpose, or to an extent that would make such knowledge of use.to him, or to the public, in con-nection with his service as a grand juror. It is well settled that the participation of an incompetent juror in the finding thereof vitiates an indictment, and that on such showing a motion to quash should be sustained. State v. Nolan, 8 Rob. 513; State v. Jones, 8 Rob. 616; State v. Parks, 21 La. Ann. 251; State v. Rowland, 36 La. Ann. 194; State v. Griffin, 38 La. Ann. 503; State v. Thibodeaux, 48 La. Ann. 601, 19 South. 680; Marr’s Crim. Jur. 509.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be affirmed.